UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SAFETY SPECIALTY INSURANCE
COMPANY and SAFETY NATIONAL
CASUALTY COMPANY,

                    Plaintiffs,                Case No. 1:20-cv-13290

v.                                        Honorable Thomas L. Ludington
                                        United States District Judge

COUNTY OF GENESEE by its BOARD OF
COMMISSIONERS, *et al.*,

                    Defendants.

_____/

**OPINION AND ORDER (1) GRANTING AND DENYING IN PART PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT, (2) DENYING INSURED DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT, AND (3) GRANTING CLAIMANT
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This matter is before this Court upon cross-motions for summary judgment filed by all

parties. *See* ECF Nos. 24; 26; 27. For the reasons stated hereafter, Plaintiffs' Motion for Summary

Judgment will be granted as to Defendants County of Genesee and Deborah Cherry (the "Insured

Defendants") but denied as to Defendants Thomas A. Fox and Tammy Puchlak (the "Claimant

Defendants"); the County Defendants' Motion for Summary Judgment will be denied; and the

Claimant Defendants' Motion for Summary Judgment will be granted. A final judgment will be

entered separately.

**I.**

This is a declaratory-judgment action concerning whether two insurers have the duty to

defend two insureds against two lawsuits. The material facts are undisputed.

In 2018, Plaintiffs Safety Specialty Insurance ("Safety Specialty") and Safety National

Casualty Company ("Safety National") issued two insurance policies to Genesee County: the

Public Officials and Employment Practices Liability Policy (the "PO&EPL Policy") and the Commercial General Liability Policy (the "CGL Policy"). *See* Compl., ECF No. 1 at PageID.13, 22. Under the PO&EPL Policy, Safety Specialty agreed to defend and indemnify Genesee County and its employees from claims alleging certain "wrongful acts." *Id.* at PageID.14–15. Similarly, under the CGL Policy, Safety National agreed to defend and indemnify Genesee County and its employees from suits alleging certain types of injuries, including "bodily injury." *Id.* at PageID.23–24. Both policies contain various exclusions and a self-insured retention, which requires Genesee County to pay up to $350,000 toward its defense before Plaintiffs become obligated to defend or indemnify.[1] *Id.* at PageID.21, 28–29.

In November 2018, Tammy Puchlak, as trustee of the Walter Puchlak Revocable Trust Agreement Dated February 24, 2010, filed a complaint in the St. Clair County Circuit Court against Genesee County; its treasurer, Deborah Cherry; and four other Michigan counties and their treasurers. *See* Puchlak's Compl., ECF No. 1-2 at PageID.73–74. In short, she alleges that St. Clair County seized trust property to satisfy a property-tax delinquency, sold the property at auction for a price above the delinquency, and then kept the six-figure difference between the auction price and the delinquency (the "surplus proceeds"). *Id.* In Puchlak's view, St. Clair County's conduct amounted to a taking without just compensation or an excessive fine in violation of the Michigan and United States Constitutions. *Id.* at PageID.75–77. Given that other Michigan counties have allegedly engaged in the same conduct, Puchlak seeks to represent a class of Michigan property owners who had their property seized and sold by one of the five defendant counties and did not receive the surplus proceeds. *Id.* at PageID.74

---

[1] The terms of each policy are discussed in more detail in Section III.C, *infra*.

In June 2019, Thomas A. Fox filed a similar complaint in this Court against Genesee County, Deborah Cherry, and 13 other Michigan counties and their treasurers. ECF No. 1 at PageID.4. Five months later, he filed an amended complaint, adding 14 more counties and their treasurers, including Genesee County and Cherry. *Id.* Like Pachluk, Fox claims that his local county government—Gratiot County—seized his tax-delinquent property, sold it auction, and kept the surplus proceeds. *Id.* at PageID.5. Further, like Pachluk, Fox seeks to represent a class of property owners similarly victimized by Michigan counties. *Id.* at PageID.6. But in addition to alleging a taking without just compensation and excessive fine, Fox also alleges unjust enrichment and violations of substantive and procedural due process. *Id.* at PageID.7–10.

Shortly after Fox and Pauchluk filed their lawsuits, Genesee County provided notice of the lawsuits to Plaintiffs by letter. *See* Defs.' Counterclaim, ECF No. 9 at PageID.245. Plaintiffs responded that they were reserving their rights to deny coverage under both policies, citing various policy exclusions. *Id.*

In December 2020, Plaintiffs brought this case, naming as Defendants Genesee County, Deborah Cherry, and the two underlying claimants, Fox and Pachluk. ECF No. 1. Plaintiffs seek a declaration that, under the terms of both insurance policies, they have no duty to defend the Insured Defendants from the two lawsuits or to indemnify them for any damages that might be awarded. *See id.* at PageID.31–41. The Insured Defendants responded with a counterclaim against Safety Specialty only, alleging breach of contract and seeking a declaration that Safety Specialty must defend and indemnify them under the PO&EPL Policy. *See* ECF No. 9.

In October 2021, the parties filed cross-motions for summary judgment; the Insured Defendants and Claimant Defendants filed separate motions. *See* ECF Nos. 24; 26; 27. Notably,

the Claimant Defendants have declined to weigh in on the coverage issue. *See* ECF No. 24. Instead, they argue that Plaintiffs lack standing to seek a declaration against them. *Id.*

## II.

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). This Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

Though "disputed issues of contractual *intent*" often present questions of fact, "disputed issues of contractual *interpretation*" present questions of law, which "can be resolved at summary judgment." *See B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 595 (6th Cir. 2001). "[G]enuine issues of material fact do not exist simply because opposing litigants argue for different interpretations of the same contractual provision." *Id.*

## III.

### A.

Plaintiffs and the Insured Defendants seek a declaration under the Declaratory Judgment Act (DJA), 28 U.S.C. § 2201 *et seq.* The DJA provides, in relevant part:

> In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or

not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a). As the DJA's prefatory clause suggests, the threshold question is whether there is an "actual controversy" between the parties.

The Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. CONST. art. III. § 2. Over the years, the Supreme Court has sharpened this limitation with several jurisdictional rules, including standing, mootness, and ripeness. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006) (noting that mootness, ripeness, political-question doctrine, and standing "all originate in Article III's 'case' and 'controversy' language"). Importantly, the DJA "does not alter these rules or otherwise enable federal courts to deliver 'an expression of opinion' about the validity of laws." *Saginaw Cnty. v. STAT Emergency Med. Servs., Inc.*, 946 F.3d 951, 954 (6th Cir. 2020) (quoting *Muskrat v. United States*, 219 U.S. 346, 362 (1911)). Rather, it merely provides "an alternative remedy—a declaratory judgment—for existing cases or controversies." *Id.* Therefore, "when a claimant seeks declaratory relief, . . . he must satisfy the prerequisites of the [DJA] and Article III's standing baseline." *Id.* More specifically, "[h]e must plausibly allege facts that, 'under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Id.* (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007)).

Between Plaintiffs and the Insured Defendants, the answer is clear. *Id.* The Insured Defendants have asked Plaintiffs to defend them from two pending lawsuits; Plaintiffs have

refused to do so; and both sides believe that their position is grounded in Michigan law and the plain text of their agreements.[2] *See generally* ECF Nos. 1; 9.

But between Plaintiffs and the Claimant Defendants, the answer is not so clear. At bottom, Plaintiffs' attempt to rope the Claimant Defendants into a coverage dispute, to which they are otherwise complete strangers, presents a difficult question of law. Resolving that question requires a more detailed analysis.

**B.**

According to the Claimant Defendants, the problem with Plaintiffs' case is the lack of an "injury-in-fact" traceable to the Claimant Defendants. *See* Claimant Defs.' Mot. Summ. J., ECF No. 24 at PageID.353; *see also Gerber v. Herskovitz*, 14 F.4th 500, 505 (6th Cir. 2021) ("To have standing, a plaintiff must allege (1) an injury in fact (2) that's traceable to the defendant's conduct and (3) that the courts can redress." (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). In other words, Plaintiffs' dispute with the Insured Defendants has "nothing to do with [the Claimant Defendants]." *See* Claimant Defs.' Reply, ECF No. 34 at PageID.939; *see also Bromley v. Mich. Educ. Ass'n–NEA*, 178 F.R.D. 148, 162 (E.D. Mich. 1998) ("Whether a claim is brought by an individual in his own name or on behalf of a class, the plaintiff must have standing to bring the claims against all defendants."). Given that the Claimant Defendants are strangers to the insurance policies, and that no judgment has been entered in either underlying lawsuit, their argument has some persuasive force.

But the Claimant Defendants largely ignore relevant case law, much of which tends to swing in Plaintiffs' favor.

---

[2] Both sides agree that Michigan law governs the insurance policies. *See* Pls.' Mot. Summ. J., ECF No. 26 at PageID.471 (discussing Michigan insurance law); Insured Defs.' Mot. Summ. J., ECF No. 28 at PageID.560 (same).

The principal case is *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270 (1941). In *Maryland Casualty*, a liability insurer brought a declaratory action against its insured and a state-court plaintiff who sued the insured after a traffic accident in Ohio. *Id.* at 271. The plaintiff-insurer sought a declaration that it had no duty to defend or indemnify the insured under the terms of their insurance agreement. *Id.* at 272. At the time the insurer brought its case, the underlying lawsuit was still pending. *Id.* at 271. The question presented to the *Maryland Casualty* Court was whether "there [was] an 'actual controversy' within the meaning of the Declaratory Judgment Act." *Id.* at 272. The Court answered in the affirmative, citing three facts, in addition to the underlying lawsuit, which altogether indicated the presence of an actual controversy: (1) the right of the state-court plaintiff under Ohio law to "proceed against the [insurer] by supplemental process" to satisfy any judgment he obtained, (2) the right of the state-court plaintiff under Ohio law to provide notice of the accident "to prevent lapse of the policy," (3) and the possibility that "opposite interpretations of the policy might be announced by the federal and state courts." *Id.* at 273–74.

Since *Maryland Casualty* was decided, Michigan courts have adopted a similar view of standing in coverage disputes, allowing insurers to join the injured party to a declaratory action against the insured, and vice versa. *See Allstate Ins. v. Hayes*, 499 N.W.2d 743, 748 (Mich. 1993) (holding that "[t]he injured party in an insurer's action for declaratory judgment is a proper party to that action" and that insurer could not complain that injured party lacked standing against it because "[the insurer] [had] named the injured party as an interested party" and thereby "consented to a [coverage] determination"); *Auto-Owners Ins. v. Keizer-Morris, Inc.*, 773 N.W.2d 267, 270 (Mich. Ct. App. 2009) ("The *Allstate* Court clearly recognized the injured person as having a substantial interest in the case. . . . It is but a minor extension of *Allstate* to recognize the standing

of an injured person to intervene in a declaratory action concerning insurance coverage for the alleged tortfeasor.").

Moreover, this Court has previously found an actual controversy between an insurer and an injured party for purposes of the DJA. *See Essex Ins. v. Xtreme Fitness Sterling Heights*, No. 11-12293, 2012 WL 529979, at *6 (E.D. Mich. Feb. 17, 2012) (Cleland, J.) (granting insurer's motion for summary judgment in declaratory action against insured and injured party). In *Xtreme Fitness*, an insurer brought a declaratory action against its insured and an injured party after learning of the injured party's impending lawsuit. *Id.* at *1. The insured defendant never appeared to defend itself, so the Clerk of this Court entered default against it. *Id.* at *2. Despite the default against the insured, Judge Cleland held that an actual controversy still existed between the insurer and the injured party and proceeded to decide the coverage question, citing *Maryland Casualty* and *Allstate* among other cases. *Id.* at *4.

In sum, the case law suggests that in the case of a coverage dispute, the insurer typically has standing to pursue a declaration against the injured party. This case, however, is distinguishable from the relevant case law in at least one significant respect.

In all the cases discussed above, the insured was the alleged tortfeasor and would have been liable to the injured party for any damages awarded. Here, the alleged wrongdoers are not the Insured Defendants but two nonparties—Gratiot County and St. Clair County. By all appearances, the Claimant Defendants joined the Insured Defendants in the underlying lawsuits for class-representation purposes only. *See* Fox's Compl., ECF No. 1-1 at PageID.53 (seeking to represent class of injured property owners residing in defendant counties); Pachluk's Compl., ECF No. 1-2 at PageID.74 (same). In other words, the Claimant Defendants and the Insured Defendants are adverse to one another only insofar as they have different stakes in the outcome of the underlying

lawsuits. And even if the Claimant Defendants prevailed in their lawsuits, it is unclear to what extent, if any, the Insured Defendants would be liable to the Claimant Defendants for damages.

For the most part, Plaintiffs ignore this distinction in their briefing. Instead, they argue that they can maintain this action against the Claimant Defendants because the Claimant Defendants are "interested parties to [the insurance] policies." *See* Pls.' Resp., ECF No. 32 at PageID.923. They also suggest that any judgment entered against the Claimant Defendants in this case would bind "the putative class of plaintiffs they purport to represent." *Id.* Neither suggestion is true.

First, though an injured party has a substantial interest in its tortfeasor's coverage dispute, *see Allstate*, 499 N.W.2d at 748, the Insured Defendants are not the Claimant Defendants' tortfeasors. As discussed above, the Claimant Defendants are not only strangers to the insurance policies but also strangers to the Insured Defendants. Absent their positions in the underlying lawsuits, there would be no reason to suspect the Claimant Defendants had any dealings with the Insured Defendants. Accordingly, there is no reason to believe that the Claimant Defendants have an interest in the coverage dispute.[3]

Second, Plaintiffs have not identified, and this Court is unaware of, any authority suggesting that a declaratory judgment entered against a defendant who seeks to represent a putative class in *another* case would bind that putative class. Plaintiffs' correctly note that, under Michigan law, "[an] insurer must make the victim a party to the action for declaratory judgment" to make the coverage determination binding against the victim. *See* ECF No. 32 at PageID.930

---

[3] Ironically, to the extent that the Claimant Defendants have any interest, it would seem to align with Plaintiffs' interest. In their reply, the Claimant Defendants state that they "would strategically prefer that there be <u>no</u> duty to defend" so that the Insured Defendants would stop "the current foot-dragging in the [underlying] litigation." *See* ECF No. 34 at PageID.939 n.1.

(quoting *Allstate*, 499 N.W.2d at 748 n.12). But as indicated, the Claimant Defendants are not "victims" of the Insured Defendants, and Plaintiffs have not attempted to join any such victims.

Admittedly, the unusual facts of this case make for a close jurisdictional question, and a slight variation in the facts might have counseled a different result. Indeed, "[t]he difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree." *Maryland Cas.*, 312 U.S. at 273. But at this juncture—where the Claimant Defendants may or may not prevail in their lawsuits, and where, even if they prevail, they may or may not recover damages from the Insured Defendants—it cannot be said that a "substantial controversy" of "sufficient immediacy and reality" exists between Plaintiffs and the Claimant Defendants. *Id.* at 273.

For these reasons, Plaintiffs' Motion for Summary Judgment will be denied as to the Claimant Defendants for lack of jurisdiction; the Claimants Defendants' Motion for Summary Judgment will be granted, and Plaintiffs' claims against them will be dismissed without prejudice. *See Thompson v. Love's Travel Stops & Country Stores, Inc.*, 748 F. App'x 6, 11 (6th Cir. 2018) ("[T]he general rule [is] that a dismissal for lack of standing is without prejudice.").

### C.

Having established the existence of an actual controversy between Plaintiffs and the Insured Defendants, the next issue is whether the exercise of declaratory jurisdiction is appropriate.

As the DJA indicates, federal courts "may" declare the rights of parties invoking declaratory jurisdiction. *See* 28 U.S.C. § 2201(a); *W. World Ins. v. Hoey*, 773 F.3d 755, 758 (6th Cir. 2014) ("Federal courts, and federal district courts in particular, have 'unique and substantial discretion in deciding whether to declare the rights of litigants.'" (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995)). The Sixth Circuit has identified five factors that courts should consider when deciding whether to exercise declaratory jurisdiction:

> (1) [W]hether the declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata;" (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective.

*United Specialty Ins. v. Cole's Place, Inc.*, 936 F.3d 386, 396 (6th Cir. 2019) (quoting *Grand Trunk W. R.R. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984)). The fourth factor is divided into three subfactors:

> (1) [W]hether the underlying factual issues are important to an informed resolution of the case;
> (2) whether the state trial court is in a better position to evaluate those factual issues than is the federal court; and
> (3) whether there is a close nexus between underlying factual and legal issues and state law and/or public policy, or whether federal common or statutory law dictates a resolution of the declaratory judgment action.

*Id.* (quoting *Scottsdale Ins. v. Flowers*, 513 F.3d 546, 560 (6th Cir. 2008)). Here, the five *Grand Trunk* factors weigh in favor of exercising declaratory jurisdiction.

**i.**

The first two factors—whether the declaratory action would (1) "settle the controversy" or (2) "clarify[] the legal relations in issue"—"often overlap substantially." *Cole's Place*, 936 F.3d at 397 (quoting *Grand Trunk*, 746 F.2d at 326). This case is no exception. Here, the controversy is whether Plaintiffs have a duty to defend or indemnify the Insured Defendants given the allegations of the underlying lawsuits. By all appearances, this controversy can be settled by reference to the terms of the two insurance policies. *See Rory v. Cont'l Ins.*, 703 N.W.2d 23, 26 (2005) ("[I]nsurance policies are subject to the same contract construction principles that apply to any other species of contract.").

- 11 -

Of course, not all coverage disputes can be settled with a declaratory judgment in federal court. As the Sixth Circuit has explained, a declaratory judgment might not settle a coverage dispute "when issues relevant to the coverage [dispute] are actually and concurrently being litigated in state court" or when state-law indemnification proceedings are ongoing. *See Cole's Place*, 936 F.3d at 398. But here, no relevant issue is being litigated elsewhere, and neither case has proceeded to a judgment.

For these reasons, the first two *Grand Trunk* factors weigh in favor of exercising declaratory jurisdiction.

### ii.

The third factor asks "whether the declaratory remedy is being used merely for the purpose of 'procedural fencing.'" *Grand Trunk*, 746 F.2d at 326. Here, there is no evidence that Plaintiffs brought this action for purposes of procedural fencing. Indeed, Plaintiffs brought this action nearly 18 months *after* Fox filed the most recent lawsuit against the Insured Defendants. *See* ECF No. 1 at PageID.4. Such delay tends to weigh against the notion that Plaintiffs were motivated by procedural fencing. *See Cole's Place*, 936 F.3d at 399 ("[W]e generally do not make a finding of procedural fencing if the declaratory-judgment plaintiff filed after the commencement of litigation in state court."). Therefore, the third *Grand Trunk* factor is neutral. *See id.* ("If there is no evidence of procedural fencing, we often find that the factor is 'neutral' . . . ." (quoting *Travelers Indem. Co. v. Bowling Green Pro. Assocs.*, 495 F.3d 266, 272 (6th Cir. 2007)).

### iii.

The fourth factor asks "whether the use of a declaratory action would increase friction between [the] federal and state courts and improperly encroach upon state jurisdiction." *Grand Trunk*, 746 F.2d at 326. As indicated, the Sixth Circuit divides the third factor into three subfactors.

The first subfactor asks "whether the underlying factual issues are important to an informed resolution of the case." *Flowers*, 513 F.3d at 560. Here, both sides agree that this case presents a disputed question of law—namely, the scope of Plaintiffs' duty to defend and indemnify—that can be decided based on the undisputed facts. Similarly, this Court is unaware of any disputed question of fact that must be decided before judgment may be entered. Accordingly, the first subfactor weighs in favor of declaratory jurisdiction.

The second subfactor—"whether the state trial court is in a better position to evaluate those factual issues than is the federal court"—is neutral. *Flowers*, 513 F.3d at 560. As previously mentioned, there are essentially no issues of fact that a state court or any other court would need to decide before the coverage question can be decided. *Cf. Cole's Place*, 936 F.3d at 401 (finding second subfactor neutral where "no unresolved factual issues relevant to the coverage question [were] pending in the state-court action").

The third and final subfactor—"whether there is a close nexus between underlying factual and legal issues and state law and/or public policy, or whether federal common or statutory law dictates a resolution of the declaratory judgment action"—weighs against declaratory jurisdiction. The coverage dispute here turns on a question of state not federal law. *See id.* (weighing second subfactor against declaratory jurisdiction where "[n]o federal-law questions [were] involved in the coverage issue").

With one neutral subfactor and the two other subfactors balancing out, the fourth *Grand Trunk* factor is neutral.

### iv.

The fifth factor asks "whether there is an alternative remedy which is better or more effective." *Grand Trunk*, 746 F.2d at 326. The Sixth Circuit has previously found that "an

alternative remedy is 'better' than federal declaratory relief if state law offers a declaratory remedy or if coverage issues can be litigated in state-court indemnity actions." *Cole's Place*, 936 F.3d at 401. Here, Plaintiffs could have sued the Insured Defendants in Michigan court using Michigan's declaratory remedy. *See* MICH. CT. R. 2.605 ("In a case of actual controversy within its jurisdiction, a Michigan court of record may declare the rights and other legal relations of an interested party seeking a declaratory judgment, whether or not other relief is or could be sought or granted."). Though the state and federal remedies are practically identical, "the state remedy has the advantage of allowing the state court to apply its own law." *Cole's Place*, 936 F.3d at 401. For this reason, the fifth *Grand Trunk* factor weighs against declaratory jurisdiction.

**v.**

In summary, the first two *Grand Trunk* factors favor declaratory jurisdiction; the third and fourth factors are neutral; and the fifth factor disfavors declaratory jurisdiction. On balance, the five *Grand Trunk* factors weigh in favor of declaratory jurisdiction. Accordingly, this Court will exercise its declaratory jurisdiction to declare the rights of Plaintiffs and the Insured Defendants under the two insurance policies.

**D.**

As previously mentioned, the primary issue is whether Plaintiffs are obligated to defend the Insured Defendants from the two underlying lawsuits.[4]

In Michigan, "[i]nterpretation of an insurance policy ultimately requires a two-step inquiry: first, a determination of coverage according to the general insurance agreement and, second, a decision regarding whether an exclusion applies to negate coverage." *Auto-Owners Ins. v.*

---

[4] Though the duty to defend is analytically distinct from the duty to indemnify, the parties agree that, in this case, the duty to defend is broader than the duty to indemnify. *See* ECF No. 26 at PageID.471 (noting that "[u]nder Michigan law, an insurer's duty to defend is much broader than its duty to indemnify").

*Harrington*, 565 N.W.2d 839, 841 (Mich. 1997). "While the burden of proving coverage is on the insured, it is incumbent on the insurer to prove that an exclusion to coverage is applicable." *Pioneer State Mut. Ins. v. Dells*, 836 N.W.2d 257, 263 (Mich. Ct. App. 2013) (citing *Heniser v. Frankenmuth Mut. Ins.*, 534 N.W.2d 502, 510 (Mich. 1995). "Exclusionary clauses in insurance policies are strictly construed in favor of the insured." *Auto-Owners Ins. v. Churchman*, 489 N.W.2d 431, 434 (Mich. 1992). Still, "[a]n insurance policy is subject to the same contract interpretation principles applicable to any other species of contract," *Dells*, 836 N.W.2d at 262, and a court must give effect to "[c]lear and specific exclusions," *Chuchman*, 489 N.W.2d at 434.

The Michigan Supreme Court has adopted a particularly broad view of an insurer's duty to defend. In short, an insurer's duty to defend "depends upon the allegations in the complaint of the third party in his or her action against the insured." *Protective Nat. Ins. Co. of Omaha v. City of Woodhaven*, 476 N.W.2d 374, 375 (Mich. 1991) (quoting *Detroit Edison Co. v. Michigan Mut. Ins.*, 301 N.W.2d 832, 835 (Mich. Ct. App. 1981)). The duty is "not limited to meritorious suits and may even extend to actions which are groundless, false, or fraudulent, so long as the allegations against the insured *even arguably* come within the policy coverage." *Id.* (quoting *Detroit Edison*, 301 N.W.2d at 835). Further, "[a]n insurer has a duty to defend, despite theories of liability asserted against any insured which are not covered under the policy, if there are *any* theories of recovery that fall within the policy." *Id.* at 376 (emphasis added) (quoting *Detroit Edison*, 301 N.W.2d at 835). But "the duty to defend is not an unlimited one," and "[t]he insurer is not required to defend against claims for damage expressly excluded from policy coverage." *Meridian Mut. Ins. v. Hunt*, 425 N.W.2d 111, 114 (Mich. Ct. App. 1988).

**i.**

The first step in Michigan's two-step inquiry is to determine whether either the CGL Policy or the PO&EPL Policy covers either of the two underlying lawsuits. *See Harrington*, 565 N.W.2d at 841.

**a.**

The CGL Policy provides, in relevant part:

**SECTION I – COVERAGES**

**COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1. Insuring Agreement**
    **a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result . . .
    **b.** This insurance applies to "bodily injury" and "property damage" only if:
        **(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory;"

\*\*\*

**COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY**

**1. Insuring Agreement**
    **a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply.
    **b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

- 16 -

\*\*\*

## COVERAGE C – MEDICAL PAYMENTS

**1. Insuring Agreement**
    **a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:
        **(1)** On premises you own or rent;
        **(2)** On ways next to premises you own or rent; or
        **(3)** Because of your operations;

\*\*\*

## SECTION V – DEFINITIONS

\*\*\*

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

\*\*\*

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**14.** "Personal and advertising injury" means injury, including consequential "bodily injury," arising out of one or more of the following offenses:
    **a.** False arrest, detention or imprisonment;
    **b.** Malicious prosecution;
    **c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling, or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;
    **d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;
    **e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;
    **f.** The use of another's advertising idea in your "advertisement"; or
    **g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

ECF No. 1-4 at PageID.185, 190, 192, 197, 199.

Plaintiffs argue that they have no duty to defend the Insured Defendants under the CGL Policy because neither Fox nor Pachluk have alleged an injury falling within Coverage A, B, or C. *See* ECF No. 28 at PageID.572–80. This Court agrees.

To begin, neither Claimant Defendant has alleged medical expenses (Coverage C) or a "personal and advertising injury" (Coverage B). *See generally* Fox Compl., ECF No. 1-1; Pachluk Compl., ECF No. 1-2.

Similarly, even though both Claimant Defendants arguably allege "property damage," insofar as they seek damages for the "loss of property," they do not allege the loss of property "caused by an 'occurrence'" (Coverage A). *See* ECF No. 1-4 at PageID.199. The CGL Policy defines "occurrence" as an "accident." *Id*. As an undefined term, "accident" must be given its "plain and ordinary meaning." *Holland v. Trinity Health Care Corp.*, 791 N.W.2d 724, 727 (Mich. 2010); *see also id.* ("Courts may consult dictionary definitions to ascertain the plain and ordinary meaning of terms undefined in an agreement."). Accident is commonly defined as "an unforeseen and unplanned event or circumstance." *See Accident*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/accident          [https://perma.cc/R3CC-6JXH]. Similarly, the "[Michigan] Supreme Court has 'repeatedly stated that an accident is an undesigned contingency, a casualty, a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated and not naturally to be expected,'" *Home-Owners Ins. v. Smith*, 885 N.W.2d 324, 327 (Mich. 2016).

As previously mentioned, the Claimant Defendants do not allege that their property was taken by chance or some unforeseen circumstance. Rather, they allege that the Insured Defendants purposefully kept the surplus proceeds from the sale of their property. *See* ECF No. 1-1 at PageID.50; ECF No. 1-2 at PageID.73. Such allegations do not even "arguably" fall within the

CGL Policy's coverage. *See City of Woodhaven*, 476 N.W.2d at 375 (noting that duty to defend applies "so long as the allegations against the insured *even arguably* come within the policy coverage" (quoting *Detroit Edison*, 301 N.W.2d at 835)).

Moreover, the Insured Defendants have all but conceded that the CGL Policy does not cover the underlying lawsuits. *See* Insured Defs.' Resp., ECF No. 30 at PageID.838 n.1. ("The [Insured] Defendant do not argue that the CGL Policy . . . provides coverage for the underlying lawsuit.").

For these reasons, Plaintiffs have no duty to defend the Insured Defendants under the CGL Policy.

**b.**

The PO&EPL Policy provides, in relevant part:

**SECTION I – COVERAGES**

1. **Insuring Agreement**
   The **Company** will pay on behalf of the **Insured** those **Damages** resulting from a **Wrongful Act** to which this insurance applies. The **Claim** must be first made during the **Policy Period** and reported to the **Company** in compliance with **SECTION IV - GENERAL CONDITIONS**, Item 7. or any applicable reporting period under **SECTION V - EXTENDED REPORTING PERIOD**.

   The **Wrongful Act** must take place in the **Policy Territory** and must occur:
   A. During the **Policy Period**; or
   B. Subsequent to the **Retroactive Date**, if any, stated in the Declarations of this policy, but only if:
      (1) The **Insured** did not give notice relating to the **Wrongful Act** under any other policy of insurance; and
      (2) Before the effective date of this policy, no **Insured** knew or had a basis to believe that the circumstances of such **Wrongful Act** might reasonably be expected to result in or give rise to a **Claim**.

\*\*\*

1. **Defense, Self-Insured Retention, and Supplementary Payments**[5]
   A. This policy is subject to a Self-Insured Retention applicable to each **Wrongful Act** which must be paid by the first **Named Insured**. The Self-Insured Retention includes the payment of **Claims Expenses** and/or **Damages** within the limit shown in the Declarations as the Self-Insured Retention.
   B. Once the Self-Insured Retention has been paid and subject to the terms of this policy, the **Company** shall have the right and duty to defend the **Insured(s)** against a **Claim** covered by this policy, except where otherwise excluded. The **Company** shall have no obligation to defend any **Claim** that is not covered by this policy and no obligation to defend after the applicable Limit of Liability has been exhausted.

***

## SECTION VII – DEFINITIONS

***

3. **Claim** means any of the following received by an **Insured** and alleging a **Wrongful Act** during the **Policy Period** or subsequent to the Retroactive Date, if applicable:
   A. A written demand for **Damages** or a notice advising an **Insured** of an intent to sue for **Damages** or a right to sue for **Damages**;
   B. Notice of an arbitration or alternative dispute proceeding seeking **Damages** to which the **Insured** must submit or does submit with the **Company's** consent; or
   C. A civil proceeding alleging **Damages** commenced by the service of a summons, complaint or similar pleading.

***

16. **Wrongful Act** means any of the following committed by an **Insured** in the performance of the **Insured's** official duties for or on behalf of the **Named Insured**:
    A. Any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty; or
    B. Any **Wrongful Employment Practice**.

ECF No. 1-3 at PageID.122–23, 132–33.

---

[5] Likely by mistake, this subsection and the preceding subsection, named "Insuring Agreement," are both numbered "1."

Given the definitions above, the PO&EPL Policy seemingly covers both underlying lawsuits. Indeed, it is undisputed that both lawsuits are "Claims" insofar as both involve civil proceedings seeking damages for "Wrongful Acts"—specifically, for the allegedly unconstitutional taking of surplus proceeds.

Even so, Plaintiffs deny that the Policy covers the lawsuits due to the Policy's notice requirement. *See* ECF No. 31 at PageID.900–01. Specifically, they argue that the filing of *Rafaeli, LLC v. Oakland County*, No. 15-147429-CZ (Mich. Cir. Ct. Oct. 8, 2015) "should have informed the [Insured] Defendants that [their conduct] might 'reasonably be expected' to result in litigation against [Genesee County]." *Id.* at PageID.901. As relevant here, *Rafaeli* involved a similar constitutional challenge to Oakland County's practice of selling tax-delinquent properties and keeping the surplus proceeds. *See Rafaeli*, 2015 WL 13859576, at *1. In Plaintiffs' view, "[t]he [Insured Defendants'] awareness of the *Rafaeli* lawsuit is a material question of fact yet to be resolved which precludes summary judgment." ECF No. 31 at PageID.901.

Though persuasive in some respects, Plaintiffs' argument ultimately hinges on a procedural issue that neither side explores: the burden of proof regarding knowledge. Because there is no evidence regarding what the Insured Defendants knew when they entered the PO&EPL Policy, summary judgment would be precluded for them only if knowledge is part of their *prima facie* showing of coverage. *See Pioneer State Mut. Ins. v. Dells*, 836 N.W.2d 257, 263 (Mich. Ct. App. 2013) (noting that "the burden of proving coverage is on the insured" (citing *Heniser v. Frankenmuth Mut. Ins.*, 534 N.W.2d 502, 510 (Mich. 1995)). By contrast, if knowledge is an exclusionary issue merely disguised as a coverage issue, then the lack of evidence on this point is Plaintiffs' problem. *See id.* ("[I]t is incumbent on the insurer to prove that an exclusion to coverage is applicable."). In other words, Plaintiffs cannot avoid summary judgment by pointing to the lack

of evidence on an issue that *they* must raise and prove. *See Mosholder v. Barnhardt*, 679 F.3d 443, 448–49 (6th Cir. 2012) ("Once the moving party satisfies its initial burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact." (citing *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Here, the burden of proof as to knowledge would presumably fall on the Insured Defendants, as the notice requirement is situated in the coverage section. *See* ECF No. 1-3 at PageID.122–23. Even so, this Court declines to consider the issue further because, even if there were a material question of fact as to the Insured Defendants' knowledge, it would only preclude summary judgment *for* the Insured Defendants, not against them. Indeed, summary judgment might still be proper for Plaintiffs on one or more exclusions in the Policy, and both sides have fully briefed those exclusions.

For these reasons, this Court will assume, without deciding, that the PO&EPL Policy at least arguably covers the two underlying lawsuits. *See City of Woodhaven*, 476 N.W.2d at 375 (noting that duty to defend applies "so long as the allegations against the insured *even arguably* come within the policy coverage" (quoting *Detroit Edison*, 301 N.W.2d at 835)).

**ii.**

The second step in Michigan's two-step inquiry is to determine whether any exclusion applies. *See Harrington*, 565 N.W.2d at 841. The PO&EPL Policy contains 31 exclusions, *see* ECF No. 1-3 at PageID.129–32, and Plaintiffs rely on six of them in their briefing, *see* ECF No. 28 at PageID.563–69 (discussing Exclusions 7, 9, 12, 15, 25, and 27). Because the application of a single exclusion is sufficient to deny coverage, this Court will address the two most fitting exclusions and then consider the Insured Defendants' arguments against both.

**a.**

The exclusions section provides, in relevant part:

**Section VI – EXCLUSIONS**

This policy does not apply to, and the **Company** has no obligation to defend any **Claim**:

           ***

**9.** Arising out of:
    **a.** The issuance of bonds; or
    **b.** Tax collection, or the improper administration of taxes or loss that reflects any tax obligation.

           ***

**12.** Arising out of eminent domain, condemnation, inverse condemnation, temporary or permanent taking, adverse possession, or dedication by adverse use.

ECF No. 1-3 at PageID.128, 130.

The first issue is the meaning of the phrase "arising out of." Though the Policy does not define the phrase, the Michigan Supreme Court has previously held that the phrase "suggest[s] a causal connection between two events of a sort that is more than incidental." *People v. Johnson*, 712 N.W.2d 703, 706 (Mich. 2006) (defining "arising out of" for purposes of sentencing enhancement for criminal sexual penetration). In other words, "[s]omething that 'aris[es] out of,' or springs from or results from something else, has a connective relationship, a cause and effect relationship, of more than an incidental sort with the event out of which it has arisen." *Id.* Similarly, as this Court recently explained in the context of a Michigan coverage dispute, "'[a]rising out of' is generally understood to mean 'originating from,' 'having its origin in,' 'growing out of' or 'flowing from' or in short, 'incident to or having a connection with.'" *Great Am. Fid. Ins. v. Stout Risius Ross, Inc.*, 438 F. Supp. 3d 779, 784 (E.D. Mich. 2020) (quoting *Assurance Co. of Am. v.*

*J.P. Structures, Inc.*, 132 F.3d 32 (6th Cir. 1997) (unpublished table decision) (cleaned up)); *see also Arise*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/arise [https://perma.cc/K49E-7RUF] ("[T]o originate from a source.").

Accordingly, Plaintiffs have no obligation to defend the lawsuits if they originate from or are otherwise causally connected to "tax collection" (Exclusion 9), "condemnation," "inverse condemnation," or "temporary or permanent taking" (Exclusion 12). Because the Policy leaves these terms undefined, they must be given "their plain and ordinary meaning." *Holland*, 791 N.W.2d at 727.

"Tax collection" means "the act or process of collecting" "a charge usually of money imposed by authority on persons or property for public purposes." *Collection*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/collection [https://perma.cc/JB9Y-QZUF]; *Tax*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/tax [https://perma.cc/HKV2-GJ7C].

"Condemnation" means "[t]he determination and declaration that certain property (esp. land) is assigned to public use, subject to reasonable compensation; the exercise of eminent domain by a governmental entity." *Condemnation*, BLACK'S LAW DICTIONARY (11th ed. 2019).

"Inverse condemnation" means "[a]n action brought by a property owner for compensation from a governmental entity that has taken the owner's property without bringing formal condemnation proceedings." *Id.*

"Temporary taking" means "[a] government's taking of property for a finite time." *Taking*, BLACK'S LAW DICTIONARY (11th ed. 2019).

"Permanent taking" means "[a] government's taking of property with no intention of returning it." *Id.*

Based on the allegations in the underlying complaints, both lawsuits arise out of tax collection, condemnation, and permanent taking. As relevant here, both Claimant Defendants allege that their local county governments seized their tax-delinquent property, sold it at a tax auction, and kept the surplus proceeds—all while acting under Michigan's General Property Tax Act, Mich. Comp. Laws § 211.1 *et seq.* ECF No. 1-1 at PageID.48–51; ECF No. 1-2 at PageID.73–75.

Though the Insured Defendants largely concede that these allegations are consistent with condemnation, *see* ECF No. 26 at PageID.480, they maintain that neither lawsuit arises out of "tax collection," because Fox alleged in his complaint that "[his] case involves what happens *after* the taxation process is complete," ECF No. 30 at PageID.857.

This argument is uncompelling. As a threshold matter, Fox's characterizations of his own complaint are relevant only to *his own* complaint, not Pachluk's. And even with respect to his own complaint, Fox's characterizations do not counsel a different result. As a matter of Michigan law, the duty to defend is governed by the "substance rather than the form of the allegations in the complaint." *See U.S. Fid. & Guar. Co. v. Citizens Ins. Co. of Am.*, 506 N.W.2d 527, 529 (Mich. Ct. App. 1993). Fox may characterize his lawsuit as "what happens *after* the taxation process is complete," but the lawsuit still "arises out of" tax collection insofar as the tax seizure and auction were causally connected to the retention of surplus proceeds.

For these reasons, based on the plain and ordinary meaning of their terms, Exclusions 9 and 12 apply to both underlying lawsuits.

### b.

The Insured Defendants advance two general arguments for why Plaintiffs cannot rely on Exclusions 9 and 12.

First, they argue that even if both exclusions apply, they only apply to some of the claims in the underlying complaints. *See* ECF No. 30 at PageID.858–59. Specifically, they argue that neither exclusion applies to "claims based on an alleged Eighth Amendment violation of procedur[al] or substantive due process." *Id.* at PageID.858. The Insured Defendants correctly note that an insurer must defend against a lawsuit "if there are any theories of recovery that fall within the policy." *City of Woodhaven*, 476 N.W.2d at 376 (quoting *Detroit Edison*, 301 N.W.2d at 385). But their reliance on the labels assigned to the different counts is misplaced.

As previously mentioned, the duty to defend turns on the "substance rather than the form of the allegations in the complaint." *See U.S. Fid. & Guar.*, 506 N.W.2d at 529; *see also Matouk v. Mich. Mun. League Liab. & Prop. Pool*, 907 N.W.2d 853, 863 (Mich. Ct. App. 2017) ("The duty to defend and indemnify is not based solely on the terminology used in the pleadings in the underlying action." (quoting *Fitch v. State Farm Fire & Cas. Co.*, 536 N.W.2d 273, 274 (Mich. Ct. App. 1995) (internal quotation marks omitted))).

Here, all 11 counts across both complaints rely on the same allegation: that county governments seized tax-delinquent property, sold it at auction, and kept the surplus proceeds. *See* ECF Nos. 1-1 at PageID.54–67; ECF No. 1-2 at PageID.75–77. This is not a case in which the underlying complaint involves different claims based on different allegations. *See, e.g.*, *City of Coll. Station v. Star Ins.*, 735 F.3d 332, 337–40 (5th Cir. 2013) (holding that inverse-condemnation exclusion did not preclude duty to defend claims based on allegations of irrational bias and tortious conspiracy). Simply put, the Claimant Defendants' decision to characterize the challenged conduct as an excessive fine or a violation of due process does not alter the substance of their allegations.

Second, the Insured Defendants argue that both exclusions apply only if the necessary conduct or event—here, "tax collection" or "condemnation"—has "be[en] established." ECF No.

30 at PageID.849. The Insured Defendants do not explain *how* these events would be "established," but presumably, a court or some other factfinding body would have to make official findings. To support their argument, the Insured Defendants point to an alleged inconsistency in the Policy's exclusions section: that some exclusions apply to claims "arising out of [an] *actual, alleged, or threatened*" event, while others apply to claims "arising out of" an event, without the "actual, alleged, or threatened" modifier. *See* ECF No. 1-3 at PageID.129–30. In their view, the absence of "actual, alleged, or threatened" in Exclusions 9 and 12 means that those exclusions apply only if the tax collection or condemnation has "be[en] established"; the mere *allegation* of tax collection or condemnation is not enough to trigger them.

Though creative, this interpretation is ultimately irreconcilable with the rest of the Policy and must be rejected. *See Royal Prop. Grp. v. Prime Ins. Syndicate, Inc.*, 706 N.W.2d 426, 432 (Mich. Ct. App. 2005) ("An insurance contract must be construed so as to give effect to every word, clause, and phrase, and a construction should be avoided that would render any part of the contract surplusage or nugatory." (citing *Klapp v. United Ins. Grp. Agency*, 663 N.W.2d 447, 453 (Mich. 2003)).

To begin, the Insured Defendants' interpretation conflicts with the Policy's definitions of "Claim" and "Wrongful Act." *See* ECF No. 1-3 at PageID.132–33 (bolding omitted). As indicated, "Claim" means "[a] civil proceeding *alleging*" both (1) "Damages" and (2) a "Wrongful Act"; "Wrongful Act" means "[a]ny actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty." *Id.* (emphasis added) (bolding omitted). The use of "alleged" in both definitions suggests that, when determining whether a lawsuit "arises out of" certain events, the starting point should be the *allegations* of the underlying complaint. Indeed, it would be

nonsensical for an allegation that constitutes the "Wrongful Act" not to trigger an exclusion involving the same conduct.

The Insured Defendants' interpretation would also undermine the Policy's limitations on the duty to defend. As previously noted, the Policy includes a self-insured retention that requires the Insured Defendants to pay $350,000 toward their own defense before Plaintiffs' duty to defend is triggered. *See* ECF No. 1-3 at PageID.116; *id.* at PageID.123 ("*Once* the Self-Insured Retention has been paid and subject to the terms of this policy, the Company shall have the right and duty to defend . . . , *except where otherwise excluded*." (emphases added)). Once the self-insured retention is exhausted, Plaintiffs obtain, among other rights, the right to appoint new defense counsel. *See id.* ("*Once* the Self-Insured Retention is exhausted, the **Company** has the right to appoint counsel of its choice to defend the **Insured(s)** . . . in lieu of defense counsel appointed by the first **Named Insured**." (emphases added)). In this way, various terms in the Policy rely on the duty to defend being determined before or around the time that the self-insured retention is exhausted. By tying that duty to certain judicial determinations, the Insured Defendants' interpretation would render the duty to defend practically unconditional. *Cf. Salvati Ins. Grp. v. Utica Mut. Ins.*, 45 F. Supp. 3d 637, 644 (E.D. Mich. 2014) (rejecting the insured's interpretation of a policy because it "would result in [the insurer] having a limitless duty to defend").

This point is underscored by Exclusion 15, which specifically provides for a limited duty to defend certain claims until certain findings are made. *See* ECF No. 1-3 at PageID.131 (excluding claims "arising out of fraud" and similar acts and omissions but providing that "if a **Claim** made against the **Insured** also seeks compensatory **Damages**, the **Company** will afford a defense to such action . . . , *until such time* as a finding or judgment is entered that such conduct or violations

occurred" (emphasis added)). The inclusion of such language suggests that Exclusion 15—and presumably the other exclusions—can be triggered by mere allegations.

The Insured Defendants also overlook the specific context in which the phrase "actual, alleged, or threatened" is used. The phrase appears in three exclusions, all of which involve claims based on hazardous substances, and all of which use a broad string of modifiers to expand the exclusionary scope.[6] *See* ECF No. 1-3 at PageID.129 (excluding claims "[a]rising out of: . . . [t]he actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of: . . . asbestos, . . . [l]ead, . . . silica, . . . [f]ungi or mold"); *id.* (excluding claims "[a]rising out of: . . . [t]he actual, alleged or threatened presence of, exposure to, discharge, dispersal, seepage, migration, release or escape of **Pollutants** at any time"); *id.* (excluding claims "[a]rising out of: . . . [t]he actual[,] alleged  or threatened presence of, exposure to, release or escape of electromagnetic fields at any time").

In context, the phrase "actual, alleged, or threatened" seems to be no more than a way of casting a particularly wide net over hazardous-substance claims—a net that encompasses not only "actual" and "alleged" exposures but also "threatened" exposures. In other words, there is no reason to think that the use of "actual, alleged, or threatened" in the hazardous-substance exclusions means that all other exclusions require some judicial determination.

Finally, to the extent that the Insured Defendants argue that Exclusions 9 and 12 are ambiguous, they are mistaken. A policy term is ambiguous only if "it can reasonably be understood in different ways." *Michigan Twp. Participating Plan v. Pavolich*, 591 N.W.2d 325, 328 (Mich.

---

[6] The only exception is Exclusion 26, which excludes claims "[a]rising out of any actual or alleged violation of the Racketeer Influenced and Corrupt Organizations Act." ECF No. 1-3 at PageID.132 (emphasis added). But Exclusion 26 is the only exclusion that addresses the violation of a specific statute, so it would seem unreasonable to infer that the usage of "actual or alleged" in that exclusion was meant to limit all other exclusions.

Ct. App. 1998) (citing *Raska v. Farm Bureau Mut. Ins. Co. of Mich.*, 314 N.W.2d 440, 441 (Mich. 1982)). And for the reasons discussed above, Exclusions 9 and 12 "fairly admit[] of but one interpretation," despite being "inartfully worded." *Id.* Thus, both exclusions "must be given their plain and ordinary meaning." *Id.* (quoting *Heniser v. Frankenmuth Mut. Ins.*, 534 N.W.2d 502, 505 (Mich. 1995)). At bottom, this Court cannot rely on the Insured Defendants' strained interpretation to "create an ambiguity where none exists." *Upjohn Co. v. N.H. Ins.*, 476 N.W.2d 392, 397 (Mich. 1991).

For all these reasons, Exclusions 9 and 12 apply to the underlying lawsuits. Because the application of either exclusion is sufficient to deny coverage, Plaintiffs' Motion for Summary Judgment will be granted as to the Insured Defendants.

## IV.

Accordingly, it is **ORDERED** that Plaintiffs' Motion for Summary Judgment, ECF No. 27, is **GRANTED AND DENIED IN PART**. Plaintiffs' Motion is **DENIED** as to the request for a declaration against the Claimant Defendants. Plaintiffs' Motion is **GRANTED** in all other respects.

Further, it is **ORDERED** that the Claimant Defendants' Motion for Summary Judgment, ECF No. 24, is **GRANTED**. All Plaintiffs' claims against the Claimant Defendants are **DISMISSED WITHOUT PREJUDICE** for lack of jurisdiction.

Further, it is **ORDERED** that the Insured Defendants' Motion for Summary Judgment, ECF No. 26, is **DENIED**.

A final judgment will issue separately.

Dated: February 8, 2022                    s/Thomas L. Ludington
                                           THOMAS L. LUDINGTON
                                           United States District Judge